RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0088p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

CARRIE SCHLAUD; EDWARD J. GROSS; NORA I. GROSS; PEGGY MASHKE; DIANA ORR, and others similarly situated,

> *Plaintiffs-Appellants,*

*v.*

RICK SNYDER, et al.,

> *Defendants,*

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; CHILD CARE PROVIDERS TOGETHER MICHIGAN,

> *Defendants-Appellees.*

No. 12-1105

———————————

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:10-cv-147—Robert J. Jonker, District Judge.

Decided and Filed: May 12, 2015

Before: MOORE and COOK, Circuit Judges; and BERTELSMAN, District Judge.*

———————————

## COUNSEL

**ON BRIEF:** William L. Messenger, NATIONAL RIGHT TO WORK LEGAL DEFENSE FOUNDATION, Springfield, Virginia, for Appellants. John M. West, BREDHOFF & KAISER, PLLC, Washington, D.C., for Appellees.

———————————

*The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

—————————————

**OPINION**

—————————————

PER CURIAM.  The named plaintiffs in this case are childcare providers who received subsidies from the State of Michigan and who objected to having a portion of these subsidies deducted for purposes of paying fees to a union that they did not wish to join.  At issue in this appeal is whether the district court abused its discretion in denying plaintiffs' motions for class certification.  We held in the first instance, *Schlaud v. Snyder (Schlaud I)*, 717 F.3d 451 (6th Cir. 2013), that the district court did not abuse its discretion in denying class certification to the named plaintiffs' proposed class and proposed subclass.  The named plaintiffs subsequently filed a petition for a writ of certiorari.  The Supreme Court granted the petition, vacated our judgment, and remanded the case back to us "for further consideration in light of *Harris v. Quinn*." *Schlaud v. Snyder*, 134 S. Ct. 2899 (2014).

In *Harris*, the Court reviewed a framework substantially similar to the one at issue here: i.e., homecare providers, who were not full-fledged state employees, were required, under the terms of a collective bargaining agreement either to join a designated union or, in the alternative, to pay the union a fee under an agency-fee provision.  The Supreme Court held that this agency-fee provision violated the First Amendment as applied to the homecare providers because these providers were not full-fledged state employees.  The Court did not, however, touch upon the issue of class certification, the sole issue that we were presented with deciding in *Schlaud I*. After carefully reviewing the *Harris* opinion and examining the briefs filed by the parties in this court and before the Supreme Court, we conclude that *Harris* does not affect our initial decision in this case regarding class certification.  Accordingly, we **AFFIRM** the district court's judgment denying class certification to the plaintiffs.

## I.  BACKGROUND

We have already reviewed the background of this case in detail, *see Schlaud I*, 717 F.3d at 454–56, and take only a moment to summarize the most pertinent facts.  Plaintiffs are home childcare providers who received subsidies from Michigan's Child Development and Care

Program ("CDC") for providing childcare services to low-income families. Under the CDC, parents choose a childcare provider, and the Michigan Department of Human Services ("DHS") then makes direct payments to that provider. Child Care Providers Together Michigan ("CCPTM"), a joint venture of two other unions, was certified as the exclusive bargaining representative for home childcare providers in Michigan. In order to obtain such certification, "a neutral third party [first] certified CCPTM as the exclusive majority collective bargaining representative of home childcare providers in Michigan[] based on the submission of 22,180 valid provider-signed authorization cards out of a possible 40,532 eligible providers." *Id.* at 454. CCPTM then petitioned the Michigan Employment Relations Commission ("MERC") for an election under Michigan law. A secret-ballot election of childcare providers was conducted and, of the 6,396 ballots cast, 5,921 were in favor of the CCPTM. MERC certified CCPTM as the exclusive bargaining representative based on the results of this election.

Shortly afterwards, CCPTM began negotiations over a collective bargaining agreement with the Michigan Home Based Child Care Council ("the Council"), an organization created through an Interlocal Agreement between DHS and Mott Community College. The proposed collective bargaining agreement required all home childcare providers receiving subsidies from the CDC either to become members of CCPTM or to pay CCPTM an agency fee through a subsidy deduction. CCPTM submitted this proposed agreement to its members for ratification. In a mail-ballot election, 4,806 home childcare providers voted in favor of the agreement, seventy-eight providers voted against it, and twenty-two ballots were spoiled. The collective bargaining agreement became effective on January 1, 2008. *Id.* at 454–55. "In January 2009, DHS began deducting 1.15% from subsidy payments made to home childcare providers. The deducted funds were sent to the Council, which then forwarded them to [CCPTM]." *Id.* at 455 (citations omitted).

In February 2010, Carrie Schlaud and five other home childcare workers filed a putative class action, alleging that their First Amendment rights had been violated by the collective bargaining agreement's requiring them to pay union dues or agency fees to CCPTM through subsidy deductions. Plaintiffs prayed for injunctive relief, declaratory relief, and money

damages.  A year later, they moved for class certification, requesting that the district court certify the following plaintiff class:

> All individuals who:  (1) are home childcare providers in the State of Michigan, including all those classified as Group Homes, Family Homes, Relative Care Providers, or Day Care Aides, and, (2) have had any Union dues or fees deducted from the subsidy paid to them by Michigan's Department of Human Service.

R. 63 (Mot. for Certification) (Page ID # 634–35).

In March 2011, Michigan stopped the subsidy deductions, "after the new legislative and executive leaders of the State terminated the [collective bargaining] arrangement and entered into a settlement agreement with the plaintiffs, which included a provision prohibiting the state defendants from requiring home childcare providers to financially support a union as a condition of receiving subsidies for home childcare."  R. 118 (D. Ct. Op. at 1) (Page ID #2589).  After the parties stipulated to the terms of this settlement agreement, the CCPTM tendered to the named plaintiffs the maximum amount of damages they could recover.  *Id.* at 2 (Page ID #2590).  Thus, the only remaining issues were, as framed by the district court, "1) whether this case is appropriate for class certification; and 2) whether the case is moot in any event."  *Id.* at 2 (Page ID #2590).

On the first question, the district court denied plaintiffs' motion for class certification.  It pointed to the fact that plaintiffs' proposed class would include those 4,806 providers who had reviewed the proposed collective bargaining agreement and had voted in favor of the provisions requiring the payment of union dues or agency fees.  This would create a conflict of interest between the plaintiffs and a substantial part of their proposed class, thus undermining the adequacy requirement that parties must comply with in order successfully to bring a federal class action.  *See* Fed. R. Civ. P. 23(a)(4) ("[T]he representative parties will fairly and adequately protect the interests of the class.").  Because it determined class certification to be unwarranted under Rule 23(a)(4), the district court found the case to be moot.  It did not reach the merits of the plaintiffs' claims, R. 118 (D. Ct. Op. at 2) (Page ID #2590), and instead entered judgment in favor of the defendants and ordered the suit dismissed, R. 119 (J. at 1) (Page ID #2607).

The plaintiffs subsequently filed a motion to amend the judgment, pursuant to Federal Rule of Civil Procedure 59(e), where they proposed certification of the following subclass:

> All individuals who: (1) are home childcare providers in the State of Michigan, including all those classified as Group Homes, Family Homes, Relative Care Providers, or Day Care Aides, (2) had any Union dues or fees deducted from the subsidy paid to them by Michigan Department of Human Service, and (3) did not sign authorization cards for the Union or vote in elections that regarded Union representation or ratification of the Union's collective bargaining agreement.

R. 120 (Mot. to Amend J. at 1) (Page ID # 2608). The district court again denied plaintiffs' request, reasoning that "[s]hort of requiring depositions of each provider in the proposed subclass, it is impossible to determine the motivations behind each provider's action (or inaction) regarding the Union." R. 123 (D. Ct. Op. at 5) (Page ID # 2630).

We affirmed the district court's denials of class certification. With respect to the proposed class, we substantially concurred with the reasoning of the district court. With respect to the proposed subclass, we offered an alternative reason, pointing to the high turnover rate of home childcare providers in Michigan. *Schlaud I*, 717 F.3d at 458–59. We discuss our reasoning in greater detail below.

Following our decision, plaintiffs filed a petition for a writ of certiorari. The Supreme Court granted plaintiffs' petition, vacated our judgment, and remanded this case for further consideration in light of its decision in *Harris v. Quinn*, 134 S. Ct. 2618 (2014), a case that involved a similar compulsory agency-fee regime in Illinois. In Illinois, the salaries of personal-care providers are paid for by the state through various government subsidies. In 2003, the Illinois legislature amended the Illinois Public Labor Relations Act ("PLRA") to declare personal-care providers "public employees" of Illinois solely for purposes of PLRA coverage. 134 S. Ct. at 2626 (citing 20 Ill. Comp. Stat. 2405/3(f)). The workers held a vote, and SEIU Healthcare Illinois & Indiana was certified as the exclusive bargaining representative of the personal-care providers. SEIU and the State of Illinois subsequently entered into a collective bargaining agreement that required all personal-care providers who did not want to become members of the Union to pay "fair share" agency fees, which (like the fees in this case) were deducted directly from their salaries. *Id.*

A group of personal-care workers filed a putative class action on behalf of all personal assistants in Illinois, seeking "an injunction against enforcement of the fair-share provision and a

declaration that the Illinois PLRA violate[d] the First Amendment insofar as it require[d] personal assistants to pay a fee to a union that they d[id] not wish to support." *Id.* The Supreme Court agreed with the objecting personal-care providers. In reaching its decision, the Court distinguished *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), which held that state employees who did not wish to join a union could nonetheless be obligated to pay an agency fee. The Court stated that *Abood* involved "full-fledged public employees," *id.* at 2638, while personal-care providers in Illinois were, at best, only "partial-public" or "quasi-public" employees, *id*. The Court reached this conclusion because, under the PLRA, personal-care providers were considered state employees only for purposes of collective bargaining; the customer retained control over most of the other aspects of the employment relationship, such as hiring, training, and discipline. *Id.* at 2634–36. Having distinguished *Harris* from *Abood*, the Supreme Court then found that the agency-fee provision in Illinois did "not serve a 'compelling state interes[t] . . . that c[ould] [not] be achieved through means significantly less restrictive of associational freedoms.'" *Id.* at 2639 (first alteration in original) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2289 (2012)). The Court rejected the argument that the agency-fee provision promoted labor peace and benefited the personal-care providers in a way that could not be achieved through a less restrictive alternative. *Id.* at 2639–41.

## II. DISCUSSION

### A. Standard of Review

On the issue of class certification, we have noted that "[t]he district court maintains substantial discretion in determining whether to certify a class, as it possesses the inherent power to manage and control its own pending litigation." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 559 (6th Cir. 2007) (internal quotation marks omitted). On the issue of Rule 59(e) motions, we have stated that a "[district] court *may* grant a Rule 59(e) motion to alter or amend if there is: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005) (emphasis added). We review both decisions—the decision to deny class certification and the decision to deny a Rule 59(e) motion—under an abuse-of-discretion standard. *See Beattie*, 511 F.3d at 559; *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014).

"An abuse of discretion occurs when we are left with the 'definite and firm conviction that the [district] court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors' or 'where it improperly applies the law or uses an erroneous legal standard.'" *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002) (alterations in original) (quoting *Huey v. Stine*, 230 F.3d 226, 228 (6th Cir. 2000)).

## B. Analysis

The state framework at issue in *Harris* closely parallels the one at issue in this case. Like the personal-care providers in *Harris*, childcare providers in Michigan are only loosely affiliated with the state: they receive subsidy payments from the state but are otherwise supervised by the individual customer. Indeed, unlike the providers in *Harris*, providers in Michigan are not even employed by the state. *Schlaud I*, 717 F.3d at 454. In other words, were the merits of the plaintiffs' claims before us, we think that *Harris* would have much to say. But the merits of their claims are not in front of us, as made patently clear by the plaintiffs in their own petition for a writ of certiorari.

To refresh: the plaintiffs brought suit against the defendants, seeking injunctive relief, declaratory relief, and money damages. R. 1 (Complaint at 13–14) (Page ID #13–14). In their petition for a writ of certiorari, the plaintiffs acknowledged that, by 2011, they had "settled their claims for injunctive and declaratory relief against the State and stipulated to [their] dismissal from the case." Pet. for Writ of Cert. at *6. This settlement left, as a practical matter,[1] money damages as the only remaining claim—a fact that the plaintiffs also conceded when they noted, in the very next line of their petition, that "[t]he Providers' remaining claims are for compensatory and nominal damages from the Union for the compulsory fees wrongfully seized from providers." *Id.*

We can think of this claim for money damages as comprising two sub-claims: money damages owed to the named plaintiffs and money damages that might be owed to other childcare

---

[1]Plaintiffs also technically continued to have a claim for declaratory relief against the Union. But the district court explained, in its opinion denying class certification, why the viability of this claim rested on the viability of plaintiffs' class certification claim. R. 118 (D. Ct. Op. at 16–17) (Page ID #2604–05). Plaintiffs have not meaningfully challenged this finding and have all but acknowledged this point, as evidenced by the arguments made in their own filings before the Supreme Court.

providers in Michigan.  There is no need for us to touch on the first sub-claim, as the plaintiffs once again have acknowledged that the Union "tender[ed] checks to the named plaintiffs for all of the monetary relief they could individually recover." *Id.* "Thus," according to plaintiffs' own petition for a writ of certiorari, "whether this action presents a live case and controversy depends on whether a class [should be] certified." *Id.*

Whether a class should be certified and whether the claims raised by that class have any merit are two different questions.  It is certainly possible, for instance, for a court to certify a class at the beginning of a suit, but then to find ultimately the claims raised by that class to be meritless.  Likewise, it is possible for a group of named plaintiffs to raise a potentially meritorious claim, but nonetheless be denied class certification because their interests conflict with the interests of part or all of the proposed class.  That is what happened here.

Plaintiffs' first "proposed class consists of any home childcare provider in the State of Michigan who had union dues or agency fees deducted from a subsidy payment from DHS." *Schlaud I*, 717 F.3d at 458.  We affirmed the district court's denial of class certification, reasoning that the "proposed class includes a substantial number of providers who voted in favor of financially supporting the Union in an action that alleges that the entire class was forced to support the Union financially." *Id.* "This," we noted, presents "a clear conflict within the proposed class." *Id.*  We observed that the named plaintiffs, who objected to the payment of fees under the collective bargaining agreement, had "divergent interests" from class members who voted in favor of the collective bargaining agreement. *Id.*  We concluded, therefore, that "[t]he district court did not abuse its discretion in denying certification of plaintiffs' proposed class because plaintiffs fail to meet the prerequisite of adequacy of representation under Rule 23(a)(4)." *Id.*

We also affirmed the district court's denial of class certification of the proposed subclass, pointing to the high turnover rate among childcare providers and the fact that "the Union elections occurred years before DHS made deductions from potential subclass members' subsidy payments." *Id.* at 458–59.  Together, these circumstances meant that "many of the potential subclass members did not vote in the Union elections because they were not then home childcare providers receiving subsidy payments (i.e., not eligible voters)." *Id.* at 459.  Therefore, we could

not "assume that . . . new home childcare providers [who did not vote in a Union election] [we]re uniformly opposed to supporting the Union financially because the record indicates that in each Union election, a majority of voters supported the Union." *Id*. Under these conditions, we again concluded that the district court did not abuse its discretion in denying plaintiffs' Rule 59(e) motion.

Nothing in *Harris* changes this analysis. In *Harris*, the federal district court, the Seventh Circuit, and the Supreme Court addressed the merits of the plaintiffs' claims, but did not reach the issue of class certification. *See* 134 S. Ct. at 2626. On the other hand, in this case, we are not addressing the merits of the plaintiffs' claims. We are reviewing only the district court's decisions to deny class certification with respect to the plaintiffs' proposed class and subclass. And, on this point, even after *Harris*, plaintiffs continue to fail to satisfy Federal Rule of Civil Procedure 23(a)(4). The conflict between the named plaintiffs, who oppose paying the Union an agency fee, and many members of the proposed class and subclass, who favor paying fees to the Union, means that the named plaintiffs fail to satisfy the requirement that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

In their petition for a writ of certiorari and in their supplemental briefs, plaintiffs make another argument: that we should presume that no childcare provider wanted to pay fees to the Union because of the Supreme Court's decision in *Knox v. Service Employees International Union, Local 1000*, 132 S. Ct. 2277 (2012). As an initial matter, we note that we issued our original opinion in this case after *Knox*, and that the Supreme Court did not mention *Knox* in its order granting the plaintiffs' petition, vacating our decision, and remanding this case back to us for further consideration. Nevertheless, we observe that we do not believe that *Knox* changes the result of this appeal.

As in *Harris*, *Knox* also involved a fair-share provision. Under this provision, state employees who had opted out of the union were nonetheless required to pay an agency fee, which would be "dedicated to [the union's] chargeable collective-bargaining activities." *Id.* at 2285. The agency fee, however, would be less than the full amount of regular union dues, because the nonunion members' decision to opt out meant that they could not be compelled to support the union's political and ideological projects. In 2005, the Union began a special campaign to defeat

Proposition 75 and Proposition 76, two propositions that would be before California voters in 2006. *Id.* at 2285–86. Importantly, the Union sent a letter to both union members and nonunion members, informing them of an increase in both union dues and agency fees in order to cover the costs of the special campaign. Nonunion members would therefore have to contribute to a predominately political effort, even though they had previously expressed a preference to not be part of any such efforts, as evidenced by their decision to opt out of the union. The Supreme Court held this arrangement to be unconstitutional, reasoning that, "[o]nce it is recognized, as our cases have, that a nonmember cannot be forced to fund a union's political or ideological activities, what is the justification for putting the burden on the nonmember to opt out of making such a payment? Shouldn't the default rule comport with the *probable preferences* of most nonmembers?" *Id.* at 2290 (emphasis added).

It is not apparent why the plaintiffs believe that *Knox* points in their favor. In *Knox*, the petitioners "filed [a] class-action suit on behalf of 28,000 nonunion employees who were forced to contribute money to the Political Fight-Back Fund"—a contribution that likely went against the "probable preferences" of these nonunion employees. *Id.* at 2286, 2290. This "probable preferences" argument does not apply to this case. In fact, as we have noted, most childcare providers in Michigan who have voted on the question of unionization have voted in favor of unionization. Moreover, at least 4,806 providers voted in favor of the collective bargaining agreement, which included a provision requiring the payment of either union dues or agency fees. For this group, paying union fees is not an instance of compelled speech—it is simply a requirement of the union membership to which they affirmatively agreed. That point ends the argument with respect to plaintiffs' proposed class—"any home childcare provider in the State of Michigan *who had union dues* or agency fees deducted from a subsidy payment from DHS." *Schlaud I*, 717 F.3d at 458 (emphasis added). That proposed class, by plaintiffs' own admission, contains individuals who voted for union representation and paid union dues. These individuals are not at all akin to the class of *nonunion* members certified in *Knox*. The named plaintiffs here have brought suit because they do not want to pay union dues. But their proposed class includes individuals who want to pay union dues. That is a conflict of interest.

This point likewise ends the argument with respect to plaintiffs' proposed subclass. The Supreme Court itself made this clear in *Harris*, a case decided post-*Knox*, when it noted that "a majority of the personal assistants voted to unionize. When they did so, they must have realized that this would require the payment of union dues, and therefore it *may be presumed that a high percentage of these personal assistants became union members and are willingly paying union dues*." 134 S. Ct. at 2641 (emphasis added). The plaintiffs have offered nothing to explain why we should not apply this same presumption here. In *Knox*, the probable preferences of the class were known—the 28,000 class members had decided not to become members of the Union, and it was reasonable to infer that these members would not want to contribute to a special assessment to cover the Union's political and ideological activities. Here, on the other hand, we know that (i) plaintiffs' proposed subclass would include new childcare providers who did not have an opportunity to vote in a union-related election, and that (ii) when given an opportunity to vote, a significant percentage of childcare providers in Michigan who voted decided to vote in favor of union representation. Given these facts, we do not think that the district court abused its discretion in denying class certification with respect to the plaintiffs' proposed subclass. As noted above, "[a]n abuse of discretion occurs when we are left with the 'definite and firm conviction that the [district] court . . . committed a clear error of judgment in the conclusion it reached'" or that "'it improperly applie[d] the law or use[d] an erroneous legal standard.'" *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002) (alterations in original) (quoting *Huey v. Stine*, 230 F.3d 226, 228 (6th Cir. 2000)). That is not the case here. In *Knox*, all members of the certified class indicated that they did not want to be members of the Union. In this case, on other hand, some of the members of the proposed subclass would want to be members of the Union. These two scenarios are readily distinguishable from one another.[2]

---

[2]Our analysis on this point also demonstrates why the plaintiffs' reliance on our decision in *Beattie v. CenturyTel, Inc.*, 511 F.3d 554 (6th Cir. 2007), is unavailing. First, *Beattie* involved the district court granting class certification to the plaintiffs-appellees, and we reviewed the decision to grant (rather than deny) class certification for an abuse of discretion. Second, *Beattie* involved defendant-appellant CenturyTel allegedly violating § 201(b) of the Federal Telecommunications Act. Under this provision, "CenturyTel [would have been] liable if it . . . bill[ed] for a service under a misleading description, *even where the customer requested the service*." *Id.* at 566 (emphasis added). Every CenturyTel customer would, therefore, have had an interest in holding CenturyTel liable; the *degree* of their interest (and the damages that CenturyTel would have to pay out to them) would be measured by their preferences for the particular service. Yet nowhere in *Harris* or *Knox* does the Supreme Court say that individuals who want to join a designated union and who willingly consent to paying union dues somehow have a legal interest in suing the union for collecting these dues. In fact, *Harris* appears to direct us towards the very opposite conclusion, by presuming that individuals who vote for union representation would be willing to pay for union representation, and that such an arrangement would be constitutional. Based on the voting results in prior union-

To summarize, unlike the petitioners in *Knox*, plaintiffs here have proposed a class and a subclass which would include members whose "probable preferences" would have been in conflict with their own. We therefore continue to endorse the analysis we set out in our prior opinion in *Schlaud I*: the interests of part of the proposed class and the proposed subclass continue to be in conflict with the interests of the named plaintiffs. Neither *Harris* nor *Knox* changes our view that the district court did not abuse its discretion in finding plaintiffs' proposed class or subclass certification inappropriate under Rule 23(a)(4).

### III. CONCLUSION

Accordingly, we **AFFIRM** the district court's judgment denying class certification to the plaintiffs on the basis of the plaintiffs' failure to satisfy the adequacy-of-representation requirement in Federal Rule of Civil Procedure 23(a)(4).

---

related elections, we think that the proposed subclass would include some individuals who would want to join the Union and pay union dues. That brings us back to the touchstone of our analysis: the named plaintiffs do not want to pay union dues, and they want to represent a class of childcare providers who share their view. But their proposed subclass, as well as their proposed class, includes individuals who want to pay union dues. That suggests that "the representative parties will [not] fairly and adequately protect the interest of the class," Fed. R. Civ. P. 23(a)(4), making class certification inappropriate.